UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MSCI 2007-IQ16 RETAIL 9654, LLC, | : | Case No. 1:14-cv-287 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| GARY J. DRAGUL, | : | |
| | : | |
| Defendant. | : | |

**ORDER DENYING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 20)**

This civil action is before the Court on Defendant's motion for partial summary judgment (Doc. 20) and the parties' responsive memoranda (Docs. 29, 31). Specifically, Defendant moves for summary judgment on Plaintiff's claim for a prepayment penalty. (Doc. 20).

**I. BACKGROUND FACTS**

Plaintiff initiated this action seeking enforcement of a "Limited Guaranty" executed by Defendant in connection with a $12,900,000 loan originated in October 2007. (Doc. 5 at ¶¶ 3-4). The loan is represented by a Promissory Note from five entities collectively known as "Prospect Square." (*Id.*) Plaintiff alleges that the Prospect Square entities defaulted under the Note and, therefore, Plaintiff is entitled to proceed on the Limited Guaranty against Defendant Dragul. (*Id.* at ¶ 6).

One of the categories of damages Plaintiff contends it is entitled to is the payment of a prepayment penalty designated in the Complaint as a "make-whole premium" in the

amount of $2,210,522.80 ("Prepayment Penalty"). Plaintiff contends that it properly accelerated the maturity date in the Note, and, therefore, is entitled to the Prepayment Penalty of $2,210,522.80. (Doc. 5 at ¶¶ 7, 11).

Defendant argues that: (1) the Limited Guaranty does not guarantee payment of a prepayment penalty; and (2) even if the Limited Guaranty did guarantee a prepayment penalty, the amount is not capable of being ascertained because there has been no prepayment.

## II.  UNDISPUTED FACTS[1]

1. Plaintiff, MSCI 2007-IQ16 Retail 9654, LLC ("MSCI"), initiated this action to seek enforcement of a "Limited Guaranty" executed by Defendant, Gary Dragul, in connection with a $12,900,000 loan originated in October, 2007. (Doc. 5 at 3-4).

2. The loan is represented by a Promissory Note ("Note") from five entities collectively known as "Prospect Square." (Doc. 5 at ¶¶ 3-4).

3. MSCI alleges that the Prospect Square entities have defaulted under the Note and, therefore, it is entitled to proceed on the Limited Guaranty against Dragul. (Doc. 5 at ¶ 6).

4. One of the categories of damages MSCI contends it is entitled to is the payment of a prepayment penalty designated in the Complaint as a "make-whole premium" in the amount of $2,210,522.80. (Doc. 5 at ¶ 7).

5. With respect to the Note, Paragraph 5 governs the prepayment penalty. (Doc. 5, Ex. B at ¶ 5).

6. In Paragraph 5.1, the borrower has no right to prepay under the Note until the "Open Prepayment Date" which is defined in the Note as May 1, 2017. (Doc. 5, Ex. B at ¶ 5.1).

---

[1]  *See* Doc. 22 and Doc. 30.

7. Section 5.2 of the Note provides a procedural mechanism in which the borrower may obtain a release of the Prepayment Penalty by satisfying certain conditions such as the payment of a fee and the pledge of additional collateral. (Doc. 5, Ex. B at ¶ 5.2).

8. Section 5.3 of the Note only provides for the calculation of a prepayment penalty in the instance that there has been a "Default Repayment" under the Note. (Doc. 5, Ex. B at ¶ 5.3).

9. Section 5.3 of the Note states "[s]imultaneously with each Default Repayment occurring prior to the Monthly Payment Date which is one month prior to the Maturity Date, borrower shall pay to Lender an amount equal to …" (Doc. 5, Ex. B at ¶ 5.3).

10. Section 5.3 of the Note provides that, upon repayment after acceleration or default that the prepayment penalty shall be equal to the greater of: (A) five percent (5%) of the principal amount of the Note being prepaid or (B) a calculation referred to as the Reinvestment Yield. (Doc. 5, Ex. A at ¶ 5.3).

11. MSCI contends that it has accelerated the maturity date in the Note and, therefore, is entitled to a prepayment penalty in the amount of $2,210,522.80. (Doc. 5 at ¶¶ 7, 11).

12. There has not been a payment of all or any portion of the principal amount of the note after acceleration by MSCI. (Doc. 21 at ¶ 7).

13. The Prospect Square entities have not made a payment of principal after the acceleration of the Note by MSCI. (Doc. 21 at ¶ 7).

14. The Prospect Square entities filed bankruptcy petitions under Chapter 11 in the United States Bankruptcy Court for the District of Colorado at Case Nos. 14-10896, 14-10897, 14-10899, 14-10900, and 14-10902. (Doc. 21 at ¶ 6).

15. The real estate owned by the Prospect Square entities has not been sold. (Doc. 21 at ¶ 6).

16. The Limited Guaranty provides for payment of the Guaranteed Obligations as defined in the Limited Guaranty. The Guaranty states "Guarantor" hereby enters into this Limited Guaranty ("Guaranty") in favor of Lender and hereby absolutely and unconditionally guarantees to Lender the prompt and unconditional payment

of the Guaranteed Obligations (hereinafter defined) of Borrower." (Doc. 5, Ex. A at 1).

17. The Guaranteed Obligations are subsequently defined in the Limited Guaranty as "… all sums for which Borrower is now or hereafter liable to Lender with respect to the matters specifically set forth in Sections 9.1 and 9.2 of the Note (the "Guaranteed Obligations"). (Doc. 5, Ex. B at 1).

18. MSCI contends that its state court actions seeking the appointment of a receiver and the bankruptcy of the Prospect Square entities have triggered the exception to limited recourse liability. (Doc. 5 at ¶ 12).

19. Section 9.2 provides an exhaustive list of events in which Prospect Square would be personally liable "… for any losses, liabilities or damages incurred by Lender (including, without limitation, attorneys' fees and expenses) …" Such matters include fraud, waste, the failure to apply rent after an event of default, the failure to deliver insurance or condemnation proceeds, and similar matters. (Doc. 5, Ex. B at ¶ 9.2).

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

4

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

A prepayment premium clause typically governs the situation where a borrower voluntarily elects to prepay its debt and represents the price of the option exercisable by the borrower to repay the loan in advance of its maturity. *See, e.g., In re Sidehouse, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011). Upon default and the acceleration of the loan, the maturity date advances and any subsequent payment is no longer considered a voluntary prepayment. *In Re Madison 92nd Street Assocs., LLC*, 472 B.R. 189, 195 (Bankr. S.D.N.Y. 2012). The lender forfeits the collection of a prepayment premium in such a scenario unless the parties' agreement contains a "clear and unambiguous" clause requiring payment of the prepayment premium upon default and acceleration. *Id.* at 195-196. This general rule created the problem that a borrower might actually intentionally default to acquire the right to prepay without penalty, so lenders began including provisions in loan documents to ensure the prepayment penalty would be enforceable after default. *Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 11 Misc. 3d 980, 985 (New York 2006).

The "clear purpose" of a prepayment premium "is to compensate the lender for the risk that market rates of interest at the time of prepayment might be lower than the rate of the loan being prepaid." *U.S. v. Harris*, 246 F.3d 566, 573 (6th Cir. 2001). Prepayment

5

premiums "will be allowed if the parties expressly bargained for the premiums" whether or not the prepayment was "voluntary or involuntary." *Id.* at 572. *See, e.g., Bay Coast Properties Inc. v. Nat'l City Bank*, No. H-05-015, 2006 Ohio App. LEXIS 2226, at *13 (Ohio App. May 12, 2006) ("[T]he express terms of the promissory note required that [borrower] pay a prepayment premium when it prepaid the remaining principal while the fixed loan rate remained in effect. [The lender], in collecting the premium, did not breach the promissory note; it merely enforced its rights under the contract.").

Defendant argues that the Limited Guaranty does not guarantee payment of a prepayment penalty because the provision requires both default plus a tender of payment, *i.e.*, the borrower must default under the Note *and* there must be a prepayment through the application of payment to principal.

### A. Prepayment Penalty under the Limited Guaranty

The Guaranty provides, in pertinent part, that:

> Guarantor . . . hereby absolutely, unconditionally and irrevocably guarantees AND PROMISES TO PAY TO Lender . . . all sums for which Borrower is now or hereafter liable to Lender with respect to the matters specifically set forth in Sections 9.1 and 9.2 of the Note (the "*Guaranteed Obligations*").

(Doc. 29, Ex. 3 at 1).

Sections 9.1 and 9.2 of the Note, in turn, provide, in pertinent part, as follows:

> 9.1 Except as set forth herein, Borrower shall not be personally liable for amounts due under the Loan Documents, and Lender's recovery against Borrower under this Note and the other Loan Documents shall be limited solely to the Property (as such term is defined in the Security Instrument); *provided, however,* that the limitation on recourse set forth

6

> in this Section 9 shall be null and void and completely inapplicable, and *this Note shall be with full recourse* to Borrower prior to any roll-up of the TICS as provided in Section 5.6 of the Security Instrument, *in the event of the voluntary filing by Borrower*, or the filing against Borrower by any Guarantor or any affiliate of any Guarantor, or an involuntary filing against Borrower in which Borrower or any Guarantor acts in collusion with the filing party with respect to the filing, *of any proceeding for relief under any federal or state bankruptcy, insolvency or receivership laws* or any assignment for the benefit of creditors made by Borrower.
>
> 9.2 Borrower shall be personally liable for any losses, liabilities or damages incurred by Lender (including, without limitation, attorneys' fees and expenses) with respect to any of the following matters: . . . (iii) Borrower's failure, following an Event of Default, to apply proceeds of rents or any other payments in respect of the leases and other income of the Property or any other collateral when received to the costs of maintenance and operation of the Property and to the payment of taxes, lien claims, insurance premiums, debt service, escrows, and other amounts due under the Loan Documents to the extent the Loan Documents require such proceeds to be then so applied…

(Doc. 29, Ex. 1 at §§ 9.1 and 9.2) (Emphasis added).

Defendant argues that the Guaranty is "not a full recourse guaranty" and that it "guarantees payment of only those matters specifically set forth in Sections 9.1 and 9.2 of the Note." (Doc. 20 at 6). However, by virtue of Prospect Square's filing of the Bankruptcy Case, the Note became full recourse and Defendant became fully liable on the Guaranty, including the prepayment premium.

### B. Default Repayment

Section 5.3 of the Note provides for a prepayment penalty if there has been a "Default Repayment" under the Note. (Doc. 29, Ex. 1 at §§ 5.1-5.3). The term "Default Repayment" is defined as the repayment of all or any portion of the principal amount of

7

the Note made during the continuance of any Event of Default or after an acceleration of the Maturity Date.  (*Id.* at § 1.7).

Section 3.1 of the Note provides that "[t]he whole of the principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Security Instrument and this Note…shall without notice become immediately due and payable at the option of Lender upon the occurrence of an Event of Default."  The Note defines "Security Instrument" as the Mortgage and related documents.  (Doc. 29, Ex. 2 at § 1.28).  The definition of "Event of Default" references that term's definition in the "Loan Documents," and "Loan Documents" is defined to include the Mortgage.  (*Id*. at §§ 1.15 and 3.1).  The Mortgage provides that the prepayment premium is due upon an "Event of Default:"[2]

> Upon the occurrence of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including but not limited to, the following actions, search of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender: (a) declare the entire unpaid Debt to be immediately due and payable; (including any prepayment premium or similar charge required by the Loan Documents).

(*Id.* at § 8.2(a)(a)).  Further, the Mortgage defines "Debt" as including the prepayment premium.  (*Id.* at § 1.7).

---

[2]  The Mortgage defines "Event of Default" to include the borrower's bankruptcy filing.  (Doc. 29, Ex. 2 at § 7.1(g)).

8

Defendant argues that a Default Repayment has not occurred because there has been no repayment of the Note.  Defendant relies on *Northwestern Mutual Life Insurance Co. v. Uniondale Realty Associates*, where the court called a similar clause a "comprehensive clause also using default and acceleration as the trigger for collection of a prepayment premium."  11 Misc. 3d at 987.  That clause read:

> The whole of the principal sum and interest, together with the prepayment premium…and the costs and attorneys' fees incurred by the Holder hereof in collecting or enforcing payment thereof, after default in the receipt of payment of any principal hereof, interest thereon, or the payment of any other sum due hereunder or under the terms of the Mortgages or the Security Documents…

*Id.* at 838.  This clause is similar to Section 3.1 of the Note[3] read together with the remedy provisions in the Mortgage.  Accordingly, pursuant to the plain language of the Note, Defendant did in fact make a clear and unambiguous promise to pay the prepayment penalty upon default and acceleration.

### C. Waiver

Moreover, during the pendency of this case, Defendant expressly waived his right to challenge Plaintiff's remedies pursuant to a settlement approved by the Bankruptcy Court.

On September 30, 2014, while this case was pending and Prospect Square was the debtor in the Bankruptcy Case, Defendant in his capacity as President of Prospect Square, executed a DPO Letter Agreement with Plaintiff.  (Doc. 29, Ex. 4).  Defendant also

---

[3] "The whole of the principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Security Instrument and this Note…shall without notice become immediately due and payable at the option of Lender upon the occurrence of an Event of Default."

9

executed a Joinder to the DPO Agreement as Guarantor.  (*Id.*)  The Bankruptcy Court approved the DPO Letter Agreement pursuant to an Order Approving Settlement Agreement on October 21, 2014.  (Doc. 29, Ex. 5).

Pursuant to the DPO Agreement, Plaintiff agreed to accept a discounted payoff of its loan to Prospect Square, so long as Prospect Square made payment of the Discounted Payoff Amount (as that term was defined in the DPO Agreement) on or before December 1, 2014.  In exchange for Plaintiff's agreement, Prospect Square and the Defendant agreed that: (a) they had no defenses or setoffs against Plaintiff with respect to the Loan, the Loan Documents, and the Indebtedness (as that term is defined in Section 1 of the DPO Agreements); and (b) that if a Termination Event (as that term is defined in Section 11 of the DPO Agreement), occurred, Plaintiff would no longer be bound to accept the Discounted Payoff Amount, and Prospect Square and Defendant would refrain from opposing Plaintiff's rights to enforce the Note, the Mortgage, and the Guaranty and instead would cooperate with Plaintiff's exercise of its remedies.

Paragraph e of Section 7 of the DPO Agreement entitled "Borrower's Representations, Warranties and Acknowledgements," provides:

> Borrower Parties and Guarantor do not have an defenses, setoffs, claims, counterclaims or causes of action of any kind or nature whatsoever against any of Lender Parties with respect to the Loan, the Loan Documents, the Indebtedness, and to the extent that Borrowers might otherwise have nay of such claims, Borrower Parties and Guarantor waive, release and relinquish any and all of such defenses, setoffs, claims and counterclaims.

Section 11 of the DPO Agreement entitled "Termination Events," provides:

>Each of the following shall constitute a termination event ("Termination Event"), resulting in the termination of the forbearance and any right of Borrowers to satisfy the Loan by paying the Discounted Payoff Amount…
>
>(b) If Borrowers fail to pay the Discounted Payoff Amount to Lender on or before the Forbearance Expiration Date…

The "Forbearance Expiration Date" is defined in Section 2 of the DPO Agreement as December 1, 2014.

Prospect Square failed to tender the Discounted Payoff Amount by December 1, 2014 (Doc. 29 at ¶ 9), thereby triggering Section 12 of the DPO Agreement entitled "Cooperation of Borrowers upon Termination Event," which provides:

>Upon the occurrence of a Termination Event…[i]n consideration of and as a material inducement to Lender to enter into this Agreement, each of *Borrowers and Guarantor* agrees to waive and does hereby waive and release any and all defenses and…*agrees not to challenge in any way the validity of and to fully cooperate with…any other exercise by Lender of its rights and remedies under this Agreement and the Loan Documents*, in equity or at law, whether pending on the Execution Date or commenced by Lender following the occurrence of a Termination Event. In addition, upon the occurrence of a Termination Event, *neither Borrowers nor Guarantor shall take any action of any kind or nature whatsoever, either directly or indirectly, to delay, oppose,* impede, obstruct, hinder, enjoin or otherwise interfere with*, and Borrowers and Guarantor will cooperate and comply with the exercise by Lender of any and all of Lender's rights and remedies* against Borrowers or with respect to the Property and the Other Collateral, or any other rights or remedies of Lender with respect to the Loan, the Loan Documents and this Agreement, in equity and at law, *including*, without limitation, *any actions by Lender…to enforce the Guaranty*.

(Emphasis added).

11

Therefore, the unambiguous disclaimer, release, and waiver language contained in Section 7(e) and Section 12 of the DPO Agreement estop Defendant from contesting Plaintiff's efforts to enforce its full recourse Guaranty.

## V.   CONCLUSION

Accordingly, for the foregoing reasons, Defendant's partial motion for summary judgment (Doc. 20) is **DENIED**.

**IT IS SO ORDERED**.

Date:  3/30/2015                                                                 *s/ Timothy S. Black*
                                                                                              Timothy S. Black
                                                                                              United States District Judge